The United States Court of Appeals for the Ninth Circuit is now in session. Good morning counsel. Welcome, welcome. We are now this morning scheduled to hear the case of Sanderlin v. Dwyer. Can you both hear me? Yes, your honor. Yes, good morning, your honors. And can you see the clock as well? Yes. Yes. Johnson, you may begin when you're ready. Good morning, your honors, and thank you for taking time to hear this case. Before I get started, I would like, first of all, my name is Ardell Johnson. I am appearing for defendants in this matter. And before I get started, I would like to give credit to my colleague Michael Pritchard, Matthew Pritchard, who did all of the briefing in this matter, but who cannot make the appearance this morning because unexpectedly he was appointed to the Superior Court bench in Santa Clara County before we anticipated losing him. But I do want to thank Mr. Pritchard for his good work on this case. Well, congratulations to him. Please convey our congratulations. I will. May it please the court. This morning, I would actually like to reserve, say, two minutes for rebuttal. And I would like to focus my argument this morning on defendant Jason Dwyer, Captain Dwyer. There are four principal reasons why we contend the trial court erred in failing to grant qualified immunity to Captain Dwyer. First of all, there's no clearly established law that established that it was unconstitutional for him to authorize the 37 millimeter, the use of 37 millimeter projectiles to disperse the unlawful assembly in this matter on May 29th, which was the date that he issued that authorization. Secondly, it's our contention that the court applied an incorrect legal analysis the plaintiff's Fourth Amendment claims by using an incomplete test for whether or not the plaintiffs were seized under the Fourth Amendment. Third, we believe that the court erred because there's no evidence sufficient to establish a causal connection between Captain Dwyer's authorization of the use of the 37 millimeters and the injuries that plaintiff alleged. And last but not least, we believe that the court misapplied the Graham factors by failing to consider the totality of circumstances from the perspective of a reasonable officer on the scene. And instead, the court focused on the singular plaintiffs and what they were doing. So, Mr. Johnson, may I ask you a question right at this point? Yes. Some of the points you just brought out seem to apply to the first prong of qualified immunity, which is whether if you take the facts in the light most favorable to the plaintiffs, a reasonable jury could find a constitutional violation. And assuming that the answer to that is yes, then for qualified immunity purposes, you go to the second prong, which was, was the law clearly established? And some of the points you just raised relate to the first. I'm more for them. I don't know about my colleagues, but I find the the question of whether or not the law was clearly established with respect to Dwyer in his supervisorial capacity and the constitutional violation at stake, whether for Dwyer, the law was clearly established in. You know, I would be interested in hearing your argument on that. Yes, the the trial court relied primarily, if not exclusively on Nelson, the Nelson versus Davis case for purposes of identifying what the trial court believed was clearly established law. The Nelson case is highly distinguishable from the situation that Captain Dwyer faced in May of 2020, in that in the Nelson case, there was a very small group of students who were essentially blocked into a tight space in an apartment complex, whereas Captain Dwyer was facing hundreds of protesters, a number of whom were throwing objects at police, who created a significant danger to the safety of the of the officers who were there to essentially keep the peace. And so the other difference is that in this case, in our case, what Captain Dwyer authorized was the use of a tool that was designed essentially to scare away these protesters. There was, as the court knows from reading the briefs, a declaration that the assembly had become unlawful. Could you ask, there's one question I have with respect to that particular point. Was it Dwyer who made the determination that the assembly was unlawful and declared it so? Yes, he was the incident commander on scene. And by the time that he made that determination, there had been a number of incidents that had occurred. There was an incident on the freeway where the protesters had blocked the freeway and essentially assaulted drivers and their vehicles. There were instances where, as I said, objects were being thrown at police officers. There was a police officer who had been rendered unconscious by the crowd. And at that point in time, based on the totality of the circumstances, Captain Dwyer thought that it was appropriate to issue the unlawful assembly order. And so as part of that, he authorized the officers to use these 37 millimeter tools, which as the court knows from reading the record, they're not tools that are designed to target specific individuals. They're designed to basically make a lot of noise, spew out four or five rubber pellets. Yeah. One last question in this area, from my perspective, and that is, do we know where Dwyer was during the incident that evening? Was he at the scene at the command center? Was the command center close to where all this took place? Do we know from the record? As much as we know from the record is that he was on scene. And I can't tell you exactly where on scene he was, but he was physically present for all this was occurring. That's helpful. So the reason I ask these questions is because the district court, as I understand, at the end of her ruling on whether or not the law was clearly established or whether a supervisor in his position would have understood that the law was clearly established and what it was, was that she determined that there were material factual issues in dispute that had to be resolved before you could really answer the clearly established prong of qualified immunity. What was wrong with that? Well, we disagree with that because regardless of how, well, part of that is what we think is a legal error in her failure to consider the totality of the circumstances. And essentially what she did, if you look at the record, is look at each individual plaintiff's situation and, you know, when they say they were peaceful, you know, don't take issue with that for purposes of summary judgment. But she didn't look at the totality of the circumstances. She didn't look at the fact that there were hundreds of people there in the streets. And I think that is that part of the analysis is a legal error in and of itself. The interesting thing about your comment, Your Honor, is that if Judge Freeman herself recognized, I think that there was no, I think she actually recognized there was no law that clearly said under these circumstances, Captain Dwyer acted unconstitutionally by ordering or authorizing the use of the 37 millimeters. And if you'll take a look at the supplemental excerpts from the record at page 424, which is a part of the oral argument, she says, and just to quote part of it, so that's why, in my view, the only way for supervisory liability to attach is if I determine that Dwyer and Garcia's decision to deploy the force, the police force armed with less lethal weapons that they were instructed they could use, and the skirmish line was unconstitutional. There's no basis for that that I know of at all. And close quote. And and so that's, that's really what we're looking at is whether or not. Would it make a difference in this case if the policy itself was problematic? Because I know part of the plaintiff's argument really relies on the inaccuracy of using the 37 millimeter projectiles under these circumstances. There's a suggestion that the firing is very inaccurate. It's not supposed to be directly targeted at individuals. And so how do you respond to that? I don't see any sort of direct allegation or charge that the policy itself is unconstitutional. Is that right? Is my understanding of the record correct? I don't believe there is. Ms. Moreno can correct me if I'm mistaken. And forgive me, you know, because I expected Mr. Pritchard to be arguing this. I'm not as familiar with some of those details. But I don't believe there is. But regardless, there's no case that we can find that says the use of, you know, a tool like this, which is designed to scare people away under circumstances where there is an unlawful assembly, is unconstitutional. And so that's, you know, that's where we come back to, you know, this pure question of qualified immunity and whether or not, you know, the Nelson case is a sufficient authority to have put Captain Dwyer on notice that merely authorizing the use of the 37 millimeter under circumstances where police officers are being assaulted, and people have been directed to go home. You know, there's, and because of the violence that had taken place and the fact that the overall conduct had become untenable as an unlawful assembly. Sorry, I know your time is running. And I actually had a question about Panagetti. As a defendant, I know we've been talking about Dwyer. But could I ask you about the Sanderlin claim about the 40 millimeters? So I think, as I understand your argument, you've argued that he wasn't seized because the intent was to have Sanderlin leave instead of to restrain him. But it looks like there's evidence in the record that the 40 millimeters were actually expected to incapacitate. And so I'm wondering why that evidence that 40 millimeter shots would incapacitate someone doesn't mean that that is restraint. Well, 40 millimeters have the capability of by and large, they don't. And the record indicates that, you know, if you look at the, you look at the claims of Sharkey and D Donato, for example, both of whom were hit with 40 millimeters, neither of them sustained anything close to a incapacitating injury, you know, by and large, the 40 millimeter meters are mostly. So looking at SCR 361, it says less lethal impact munitions are used to disorient and incapacitate injury should be expected. So maybe it doesn't always but if it's expected that it will, why don't the facts in light of the plane in the most in the light most favorable to the plaintiffs suggest that it was intended to restrain because it was intended to incapacitate? Well, in this, in this particular case, I don't believe that the that was the use intended. If you look at Panagetti's body worn camera video, you will hear him tell Mr. Sanderlin multiple times to move or he's going to be shot. And so, you know, the objective evidence of whether or not there was an intent to restrain is, is refuted by the fact that the clearly as the clearly stated intent by Officer Panagetti was to get him out of the way by the fact that he was instructing him to move. I know you're out of time, but let me let me see if my colleagues have any additional questions. And then I'll give you a couple of minutes back for rebuttal. I know you wanted to save that. Thank you. Miss Marino. Good morning and may it please the court. My name is Sarah Marino. I represent the plaintiffs in this matter, some of whom were unintended targets who in the face of indiscriminate force used on a crowd combined of assaultive people and non-assaultive people, passive resistors and active resistors. All of the plaintiffs in this case were either unintended targets, for instance, Brianna Contreras or arguably passive resistors such as Derek Sanderlin, who were brutally injured because of the indiscriminate force used to control a crowd. I'll begin with Dwyer because that's where Mr. Johnson began. But this is such a complicated woven story that if the court guides me, I'll move on. Let me ask on Captain Dwyer. Do we know whether because Mr. Johnson said that, for example, Sharkey was hit with a 44 millimeter. Do we know what they were hit with? We don't for some of the people. So, for instance, Sharkey, we do not know. We it's reasonable from the evidence that it was the 37 millimeter because at that point, the your theory, your theory has to be that these claims were hit with 37 millimeter rather than 40 millimeter in order to attach supervisory liability to the Captain Dwyer. Is that correct? Well, yes, because he was the one who authorized use of the 37 millimeter and that he approved his subordinates using it without coming to him each time. So he gave a blanket authorization for the rest of the evening that they could use it. And from the evidence, it seems like it was the 37 millimeter shooting multiple foam rounds in the direction of Adira Sharkey and Brianna without without some evidence that, in fact, it was 37 millimeters instead of 40. How do you survive somebody's judgment? Well, Captain Dwyer was the incident commander for all purposes. So any use of force that day was authorized by him. He's the highest ranking officer on scene and had was being kept up to date with all areas of the city hall area where protesters were. So even if it was a 40 millimeter, it would still have been under his supervision and direct authorization. But if he wasn't right there, if someone chose to use the 40 millimeter in a way that was unconstitutional, he couldn't have anticipated that. Right. And he didn't tell them to do that. So I'm not sure how you would get to him being responsible for someone making a bad decision at a moment when he wasn't right there. Um, well, he set the culture that day. He authorized brutal control of the crowd. So whether or not it was the 40 millimeter or the 37 millimeter, he set the tone, told his officers how to respond to this group, which was a mix of a very small amount of people throwing rocks or arguably passively resisting when they refused to leave as ordered. He authorized the use of 37 millimeter launchers for crowd control purposes, right? I thought that that was really the linchpin of your theory and not not that he's responsible for the 40 millimeter used by whoever as well. So that's a little bit different from what I understand your argument to be. But is there any allegation or suggestion that the policy itself is unconstitutional, that use of 37 millimeter in these circumstances is not standard accepted practice? Um, no, not in this case. That is not at issue. So, counsel, let me ask you this. Similar questions that I asked Mr. Johnson, which is, let's just stay for a moment on the first prong of qualified immunity that a reasonable jury could maybe, you know, could find a constitutional violation and then go to the second prong, which is, was the law clearly established? So under the, you know, looking at all the circumstances and what Dwyer faced that day, what do you contend is the clearly established law that should have alerted him as a supervisor? But what if, you know, he would have understood that his actions were unconstitutional? I think I would point to Gravelet Blondin v. Shelton, which is a 2013 Ninth Circuit case that says the right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008. Additionally, Nelson would put a supervisor on notice that indiscriminately shooting into a crowd that constitutional violation. And then, of course, Brendlin talks about unintended persons of which, you know, at least half of these plaintiffs were unintended, apparently. And then... So let me just see if I can understand your argument, because you're pointing to those cases. But I guess your argument is that he should have, that he read those cases, if you're familiar with those cases, he should have known that by authorizing use of the 33, of the 37 millimeter, I don't want to forget what it's called, the 37mm, that a supervisor in his position would have or should have known that the subordinate officers would have used their, those weapons in an unconstitutional way. That's your argument? Yes, because they are by definition inaccurate weapons. And they are also, the shooting of a projectile impact weapon at someone is not merely trivial force. It is a serious use of force that could injure someone. It's a weapon designed for injury and incapacitation. And he knows that the 37 millimeter has five foam batons that shoot out at the same time in different directions. So giving blanket authorization to use this at a crowd, not only was he on notice with Nelson and Gravelit, but it's also obvious. So I think, separate and apart from the fact that it's clearly established, it should have been obvious, you can't shoot indiscriminately into a crowd. And just like Nelson, these were young folks, students, the people there who were shot and who were liable to get shot with the weapons he authorized were young people voicing their anti-police sentiment. So let me ask you this, one last question for you. Is the whole linchpin of your theory that Dwyer authorized the use of the 37 millimeter? Is that set? That's the bottom line? Well, that's certainly a big piece of it. And then... What are the other smaller pieces? Just that he was in charge of the entire scene. So the use of force in general, all of the other weapons used, so the 40 millimeter, the baton, the control of the crowd's movement. And then of course, the treatment of, which is separate, the arresting of Vera Clanton, for instance, which I know is kind of a separate side issue, but... I noticed you didn't list lack of training. Your brief had said that he should have known that the officers were not properly trained. But when I looked at the site for that, it didn't seem to be about training at all. So are you now backing away from the idea that they didn't have proper training? No. So what happened was that Monell did not survive that motion for summary judgment. So I think there is reference to training, but it's not at issue, I guess, on this appeal. So I don't know if that is what's complicating it. Right. So you're not relying on the suggestion that they were not trained in how to use 37. Because I thought the red brief, the answering brief, did talk about your theory, right? Your theory is there's got to be a causal nexus. And so I thought your theory on the causal nexus is he gave blanket approval for the use of the 37 millimeter launchers. The group plaintiffs were hit with the 37 millimeter launchers. It's the use of this, it's not appropriate, because it fires in inaccurately, and the officers weren't trained on how to properly use it. I thought that was the main arguments tying the causal nexus from what happened to the captain. But what I'm hearing from your argument today is that there's no suggestion that the policy itself was not appropriate or unconstitutional. And there's no evidence suggesting that the officers weren't properly trained. And so I think that makes your causal connection argument very problematic, because it's not really tethered to the evidence in the record. I think the issue is, it's impossible to have an officer or a person trained to use it on a crowd the way it was used, because it's by definition inaccurate. So yes, I do maintain that he should have known, giving blanket authorization to these officers to shoot a weapon into the crowd, like that would necessarily result in people being hit that were unintended targets, because you can't possibly aim at someone when five batons are going to shoot out in all directions. Doesn't the policy authorize the use of this for crowd control? So it sounds like you are challenging the policy then. Just not for, that's a separate issue against the city though. So when it comes to Dwyer, whether or not he was following policy, let's just say, because I think for sake of argument, let's say there was a city policy and it's fine constitutionally, or not. Whether he was following it, he still has individual liability for allowing it to be used that way. I have one other question for you. You don't allege that Dwyer was informed that the subordinate officers had used the 37MM in an unlawful way against protesters who were just protesting, and that he then failed to take any action to stop the use of the 37MM. Is that right? He was, we do allege he was on scene, so he was there with his own eyes. He also knew that they ran out of projectiles they used in excess of 400 and had to order more. So that put him on notice that they're going overboard with the deployment of these projectiles. He also was there to see that the crowd was largely made up of people who were not aggressors. So I think that's the allegation is that he was present. He saw everything going on and didn't intervene, but also didn't withdraw his authorization. I have one more question on Dwyer, and then I'd like you to address, Hanif Gedi. There were, as I understand it, well over 240 officers from various agencies who responded. Is there any indication in the record that asked the incident commander that he was supervising officers from other agencies as well? And I ask this because the group plaintiffs weren't able to identify exactly who fired the shot that struck them. Um, thank you, Your Honor. So there was, I'm trying to find where it was, where it was established that no other jurisdiction, although a few were present, no one, there was no information that anyone else fired a weapon or used force. I'm going to have to pull that up while I'm talking if that gets to the question. Wait, I'm not sure I understand your question. So you're saying that other officers were on scene, but only San Jose Police Department officers used force, and that's how you tie it to Captain Dwyer? Right. So I think you're talking about the multi-agency response. So there's some sort of code, I'm forgetting the code name, code blue, and they asked for all neighboring law enforcement agencies to respond, and they did. Did he, as the incident commander, have any authority over them? Dwyer, I mean. Right. So I think they were at the ready. There's no evidence in the record that they were boots on the ground in the mix. So the only agency that was in the area was the Sheriff's Office of Santa Clara County, but there's zero evidence that they deployed any weapons, used any force, and they were the only ones in the vicinity. I don't know where all the other people were, if they made it to town. They were just basically summoned. I see. Okay. With regard to Hanny Getty, can you respond to Mr. Johnson's argument on seizure? Because here, you can hear on the video the order to disperse, the warning to disperse. And so how do you respond to this particular case? Because there's no objective evidence of an intent to restrain. So I think that, first of all, yes, you can hear it on the body cam, but it was a loud scene, so there's no evidence, or the evidence is from Mr. Sanderlin that he didn't hear that from where he was standing. We're hearing it with the benefit of the body camera and the microphone that the officer is speaking into, and then it records. So I would like- But it seems that Torres tells us we have to look for an intent to restrain Torres, the Supreme Court case. So why wouldn't it matter what the officer thought, even if Sanderlin didn't hear it? Well, so Nelson rejected Hanny Getty's theory. Nelson is before Torres, so it's a pretty convincing argument that Nelson is wrong after Torres and doesn't survive Torres saying there needs to be an intent to restrain. But Torres did not hold that force used for other purposes can never be held to have seized or restrained. In fact, as we see in the video, Mr. Sanderlin falls and is down, not to mention in- I actually didn't see that in the video. It looked like he did stop momentarily, but then walk away. I didn't see him fall. Okay. So he maybe momentarily was sort of frozen in pain. So is your argument that the incapacitation is sufficient to constitute a seizure under Torres? Yeah. So I think he kind of doubled over and then you're right, hobbles off and off camera falls where he remained. But yes, so the officer intended to shoot him. That's undisputed with a weapon that is meant for about qualified immunity parsing too narrowly and talks about if you're stopped by the accidental discharge of a gun that the officer only meant to bludgeon you with, for instance, or if you're shot with a bullet through the heart that was intended to only shoot you in the leg. The Brouwer court said that's an example of what we don't want is that the officer did intend to do something here. The evidence from him is that he intended to shoot in the abdomen, missed and hit the groin. But in any event, even if he had successfully shot in the abdomen, that also would have been excessive. He meant to interfere with Derek Sanderlin's movement, his actions. So if we think there is enough evidence that because the weapon intended to is expected to incapacitate, that's enough for restraint under Torres. If Torres tells us that Nelson's rule was wrong, because you need this intent to restrain, but say you can satisfy that because of the incapacitation, can we still rely on Nelson as the clearly established law? If Nelson is wrong in a way? Well, I think the difference is that Torres had no occasion to define the full scope of the meaning of restraint. And restraint is a broader term than apprehension. So it's not a requirement that Panagetti wanted to then rush and put Derek Sanderlin in handcuffs, for instance. That is not required when finding a seizure. He meant... So are you saying we can rely on Nelson? Is that what you're saying? Yes, for that concept, because Torres does not circumscribe Nelson in terms of the definition of restraint or apprehension. Let's say for a moment that Torres does get rid of that part of Nelson. Nelson was still the law at the time, because Torres comes later. Is it possible to still rely on Nelson? If you're saying that Torres... Because Torres wasn't decided yet when this incident happened. So can you rely on Nelson, because Nelson was the law at the time, even if Torres now tells us that Nelson is wrong? Well, yes, the difference, though... So I just think that Torres was about a fleeing suspect. So that was an unsuccessful attempt to apprehend that suspect. And so I just don't think that that part is applicable here. And Nelson talked about people who were sitting in one place, and had force used on them, and they weren't fleeing. In fact, they were refusing to move. So that's why Torres isn't helpful in defining seizure for us here in a circumstance with... All right. I think we've got your argument. Our questioning took you well over time, but we appreciate your helpful comments. Mr. Johnson? Let's... Let's... Oh, hold on one second. Let's put a couple of minutes on the clock. All right. Go ahead, sir. Thank you, Your Honor. I just want to respond to a couple of things. First of all, with regard to the record, and interpreting the evidence most favorably, the plaintiff, with regard to Contreras, DiDonato, and Sharkey, there's nothing in their declarations that they submitted, or in any other evidence that indicates what they were shot with. They all say that they don't know what it was that hit them. And with respect to Mr. Stukes, we know that's a 40 millimeter projectile, because he said that he pulled it out of... He pulled one out of his backpack. So with regard to that trio of Contreras, DiDonato, and Sharkey, even interpreting the evidence most favorably, there's nothing in their declarations that indicates what they were shot with. And then, I guess the last thing that I'd like to respond to is the clearly established law. The Gravlick case involved a taser in a dart mode. I don't think that's applicable here. The Nelson case, the court's well familiar with, and it's been briefed very thoroughly. So, I don't think there's much that I can add to that. At the end of the day, I think what the district court did was define clearly established law too generally. The court said that the question was whether it was clearly established that an officer couldn't shoot a projectile at an individual who was peacefully protesting. I think that the question should have been whether or not it was clearly established that it was unconstitutional to authorize the use of 37 millimeter projectiles to disperse a large crowd that was in a public space containing both peaceful and violent protesters who were engaged in violence toward police officers. So, the framing of the question makes a difference here. And what we have here is a situation where you have a crowd that has become violent, was declared as an unlawful assembly, and a tool that is used exclusively to repel or disperse people was deployed. And there's no case that I'm aware of that I've found that would indicate to Captain Dwyer that it was unconstitutional to authorize the use under those circumstances. Thank you, Your Honors. All right. Thank you very much to both sides for your argument today. They've been very helpful. The matter is submitted and we'll issue a decision in due course. Thank you. Have a great day. Thank you.
judges: PAEZ, NGUYEN, FRIEDLAND